**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO.  1:24-mj-02479-Reid

FILED BY_____TS_____D.C.

Mar 8, 2024

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - Miami

IN RE SEALED COMPLAINT
_____/

### CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek M. Maynard)?     No

2. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to October 3, 2019 (Mag. Judge Jared M. Strauss)?     No

3. Did this matter involve the participation of or consultation with now Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023?  No

Respectfully submitted,

DAVID A HUBBERT
PRINCIPAL DEPUTY ASSISTANT ATTORNEY GENERAL

Sean Beaty, Senior Litigation Counsel
District Court No. A5501870
U.S. Department of Justice, Tax Division
(202) 616-2717
Sean.P.Beaty@usdoj.gov

AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Southern District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No. 1:24-mj-02479-Reid |
| | ) | |
| Dan Rotta, | ) | |
| | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___November 10, 2011 - present___ in the county of ___Miami-Dade___ in the ___Southern___ District of ___Florida and elsewhere___ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 371 | Conspiracy to defraud the United States (*Klein* type) |
| 18 U.S.C. § 1001(a)(3) | False Statements in a Document |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

___James O'Leary Special Agent, IRS-CI___
*Printed name and title*

Attested to by the Applicant in accordance with the requirements of Fed.R.Crim.P. 4.1 by __Face Time__

Date: ___3/8/2024 at 4:30 pm___

_____
*Judge's signature*

City and state: ___Miami, Florida___   ___Hon. Lisette M. Reid, United States Magistrate Judge___
*Printed name and title*

### AFFIDAVIT IN SUPPORT OF A
### CRIMINAL COMPLAINT AND ARREST WARRANT

I, James O'Leary, being first duly sworn, hereby depose and state as follows:

1.     Your Affiant has been investigating DAN ROTTA ("ROTTA"), CO-CONSPIRATOR 1, and others for tax fraud and Bank Secrecy Act violations. This investigation has revealed that ROTTA concealed millions of dollars in assets and income from the IRS in Swiss bank accounts for several decades that he failed to report either on his Forms 1040, U.S. Individual Income Tax returns or on Reports of Foreign Bank and Financial Accounts. The total value of ROTTA's unreported assets reached approximately $20,000,000, and his investments generated tens of millions of dollars in income that caused a significant tax loss to the United States.

2.     Over the years, ROTTA conspired with CO-CONSPIRATOR 1 and others to conceal his offshore assets and income from the IRS. In or around 2011, ROTTA was audited by the IRS, and ROTTA obstructed the audit by falsely denying that he had any foreign bank accounts. At around that time, ROTTA enlisted CO-CONSPIRATOR 1 to serve as the nominee owner of his Swiss accounts, and ROTTA, CO-CONSPIRATOR 1, and others provided false documents to the IRS during the audit and subsequent Tax Court litigation to conceal ROTTA's foreign accounts. ROTTA and CO-CONSPIRATOR 1 also created sham trust structures to conceal ROTTA's offshore assets and to allow ROTTA to continue to evade taxes on the income they generated. When it became evident that ROTTA could no longer hide his foreign accounts from U.S. authorities, ROTTA submitted a false voluntary disclosure to the IRS in which he admitted he had foreign accounts, but falsely claimed most of the assets in those accounts belonged to CO-CONSPIRATOR 1 to reduce his tax penalty.

3.     The information contained in this Affidavit is based upon my personal observations and investigation, my training and experience, information obtained from other IRS agents and

analysts, information from witnesses, subpoenaed records from domestic financial institutions, foreign financial records obtained via a treaty process, publicly available information, records obtained from a search warrant issued in the Southern District of Florida and executed on an email account controlled by ROTTA (*see* 1:21-mj-02291-AOR (Feb. 2, 2021)), records obtained from a search warrant issued in the Southern District of Florida and executed at ROTTA's former residence (*see* 1:21-mj-03227-Becerra (June 23, 2021)), IRS records, and transcripts of grand jury testimony. All observations I did not personally make were related to me by the individuals who made them. This Affidavit contains information necessary to support probable cause, and it is not intended to contain all information known by me or the government.

4.     I submit this Affidavit in support of a criminal complaint and arrest warrant charging ROTTA with: (1) conspiring with CO-CONSPIRATOR 1 and others, known and unknown, to defraud the United States by impeding, impairing, obstructing, and defeating the lawful government functions of the Internal Revenue Service of the United States Department of Treasury in the ascertainment, computation, assessment, and collection of ROTTA's federal income taxes., in violation of 18 U.S.C. § 371; and (2) knowingly and willfully making and causing to be made materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of the executive, legislative, or judicial branch of the government of the United States by submitting a materially false voluntary disclosure application to the IRS, in violation of 18 U.S.C. § 1001(a)(3).

### Affiant Training and Background

5.     I am a Special Agent ("SA") with the United States Department of Treasury, Internal Revenue Service, Criminal Investigation ("IRS-CI") in the Washington, D.C. field office. I have been employed in that capacity since May 2011.

6.     My duties as a SA with IRS-CI include the investigation of possible criminal

2

violations of the Internal Revenue Laws (Title 26, United States Code), the Bank Secrecy Act (Title 31, United States Code), the Money Laundering Control Act (Title 18, United States Code), and other related offenses. Throughout my career, I have conducted several criminal investigations, during which I gained experience and familiarity with the above sections of the United States Code. During the performance of my duties, I have participated in the execution of numerous search warrants. I have experience in analyzing tax returns, accounting books, and other financial records. I graduated from the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia in August 2011. I graduated from the Special Agent Investigative Techniques program at the National Criminal Investigation Training Academy in Glynco, Georgia in December 2011. In these last two programs, I studied a variety of law enforcement, criminal investigator, and tax crime issues, including search and seizure, violations of the Internal Revenue laws, and Internal Revenue Service procedures and policies in criminal investigations. As an IRS-CI SA, I have participated in various investigations pertaining to tax fraud, money laundering, and government health care fraud. Prior to joining the Criminal Investigation division, I worked as an attorney for the Internal Revenue Service Office of Chief Counsel. I earned a Bachelor's Degree in History from John Carroll University, a Master's Degree in International Relations from the Maxwell School of Citizenship and Public Administration, a Juris Doctor from Syracuse University Law School, and a LL.M. in Taxation from Georgetown Law.

### Relevant Reporting Requirements

7.       Through my training and experience, I know that U.S. Citizens and residents who had income more than a threshold amount in any one calendar year were required pay taxes and file a Form 1040 for that calendar year with the Internal Revenue Service by April 15 of the following year. On that tax return, U.S. taxpayers were obligated to report all their worldwide

3

income, including income earned from foreign financial accounts (such as bank, brokerage, and securities accounts).

8.     U.S. taxpayers also had an obligation to report to the IRS on the Schedule B of their tax return whether they had a financial interest in, or signature authority over, a financial account in a foreign country by checking "Yes" or "No" in the appropriate box, and by identifying the appropriate country or countries where the foreign financial account(s) were maintained.

### Individuals and Entities

9.     ROTTA was a naturalized United States citizen who lived in Fisher Island, Florida and Aventura, Florida. ROTTA is also a citizen of Romania and Brazil, and at times used his dual citizenship in order conceal his overseas assets and income. However, ROTTA has been a citizen and full-time resident of the United States since at least the 1970s.

10.     CO-CONSPIRATOR 1 was a Brazilian citizen who lived in Sao Paolo, Brazil. CO-CONSPIRATOR 1 was born in Romania in 1947 and he and his family moved to Brazil shortly thereafter. CO-CONSPIRATOR 1 was not a United States citizen.

11.     ROTTA and CO-CONSPIRATOR 1 were longtime family friends and cousins.

### ROTTA's Offshore Accounts

12.     ROTTA owned and/or controlled at least two dozen financial accounts in Switzerland between 1985 and 2020. To date, the Swiss Federal Tax Administration ("SFTA") has produced at least 24 account files (some in whole, and some in part) in response to requests made by the IRS in connection with its investigation of ROTTA. These account files reveal that ROTTA maintained millions of dollars in offshore accounts for decades. Tracing the history of those accounts reveals that ROTTA was the true beneficial owner of the assets in those accounts. Over the years, however, ROTTA deliberately sought to hide his offshore assets and income behind pseudonyms, complicated corporate structures, and nominees.

4

### ROTTA's Early Offshore Account History (1985-2008)

13.     Between 1985 and 2008, ROTTA held assets in Swiss bank accounts using false names and offshore corporate structures designed to conceal his accounts from the IRS.

14.     Based on records produced by the SFTA, ROTTA's earliest *known* foreign financial account was a pseudonym account opened at Credit Suisse on or about January 3, 1985. At the time, Credit Suisse allowed customers to open accounts using a pseudonym instead of their real name. Records produced by the SFTA include records from the pseudonym account, and despite his use of a pseudonym, ROTTA's name and signature appeared on certain account records. The value of the pseudonym account is unknown, but it remained open until in or around 1989, at which time Credit Suisse's records indicate the account's assets were transferred to another Credit Suisse account held under the name Vima, Inc. ("Vima").[1]

15.     Records produced by the SFTA reveal that, between 1989 and 2001, ROTTA held assets in parallel accounts under the name Vima at both UBS and Credit Suisse. Records seized from ROTTA's residence indicate that on or about March 16, 1989, ROTTA executed an order directing UBS to form Vima as a Liberian corporation to hold accounts at UBS and Credit Suisse. At around the same time, ROTTA directed the formation of the NAD Foundation, a Lichtenstein foundation that, according to its regulations, held Vima's shares for ROTTA's benefit.[2]

16.     Despite this layered structure, ROTTA controlled and was the ultimate beneficial owner of the assets in the UBS and Credit Suisse Vima accounts as evidenced by records produced

---

[1]   Your Affiant notes that the name "Vima" appears to be a portmanteau combining the first names of ROTTA's two children who were alive at the time of Vima's formation.

[2]   Your Affiant notes that "NAD" is "Dan" spelled backwards.

by the SFTA and seized from ROTTA's residence, including: Forms A[3] executed by ROTTA in March 1989, which identified him as the beneficial owner of the assets in the Vima accounts, and signature cards executed by ROTTA in March 1989, through which he gave himself signature authority over the Vima accounts.

17.     According to records produced by the SFTA, in April 1998, ROTTA opened two accounts in his own name at Bank Julius Baer, another Swiss bank, and executed a Form A identifying himself as the beneficial owner of the assets in the accounts, as well as a document giving himself signature authority over the accounts.

18.     Two months later, in June 1998, ROTTA signed an instruction directing the bank to close the accounts held in his name and transfer the assets to new accounts held in the name of Pevima Limited,[4] a British Virgin Islands corporation.[5] Account files produced by the SFTA each contained a document giving ROTTA power of attorney authority over the Pevima Limited accounts, and one of the account files contained a Form A identifying ROTTA as the beneficial owner of the assets in that account. ROTTA identified himself as a Brazilian citizen and resident in all the Bank Julius Baer account documents even though he had long since lived in the United States.

19.     The value of ROTTA's accounts between 1989 and 2001 is unknown. However,

---

[3]   The Form A is a form promulgated by the Swiss Bankers Association that Swiss banks use to record the beneficial owner of assets in an account when the accountholder is either a natural person or a domiciliary, or shell, corporation.

[4]   Your Affiant notes that the name "Pevima" appears to be a portmanteau combining the first names of ROTTA's three children who were alive at the time of Pevima's formation.

[5]   Records maintained by the New York Secretary of State, Division of Corporations, show that ROTTA also had a domestic entity called Pevima Corporation was formed in New York State in October 1998. Records maintained by the IRS show that ROTTA stated that he used the Pevima Corporation to pay his personal expenses.

records seized from ROTTA's residence suggest that, in March 2000, ROTTA used approximately $2 million from the UBS Vima account to purchase his former residence on Fisher Island.

20.     Between November 2000 and July 2001, ROTTA closed the Pevima and Vima accounts at Credit Suisse, UBS, and Bank Julius Baer and directed the banks to transfer the assets to new accounts at those banks held in the name of Citaro International Business Corporation LTD ("Citaro"). ROTTA's decision to transfer his assets to new accounts held in Citaro's name coincided with new Swiss bank requirements for identifying U.S. accountholders that took effect in January 2001.

21.     Between November 2000 and 2003, ROTTA owned and/or controlled accounts held under the name of Citaro at UBS, Credit Suisse, and Bank Julius Baer. According to both records produced by the SFTA and records seized from ROTTA's residence, Citaro was a bearer-share corporation, formed in the British Virgin Islands, and its shares were held by the NAD Foundation for ROTTA's benefit. Other records seized from ROTTA's residence or produced by the SFTA reveal that ROTTA directed the formation of Citaro, executed an agreement indicating he was the beneficial owner of the assets in the Citaro accounts, and authorized Sinco Trust Ltd., which was controlled by Beda Singenberger, to manage the assets in the Citaro accounts on ROTTA's behalf. [6]

22.     Records produced by the SFTA and records seized from ROTTA's residence reveal that, despite the layered structure, ROTTA was the beneficial owner of, and controlled the assets

---

[6]    On or about July 21, 2011, a grand jury in the Southern District of New York returned an indictment charging Singenberger with conspiracy to defraud the United States. *See United States v. Singenberger*, 11-CR-620 (SDNY). In the Indictment, Singenberger is alleged to have devised a scheme to help U.S. persons avoid Swiss bank identity verification requirements that went into effect in January of 2001, and conspired with U.S. persons to evade their taxes by concealing their assets and income in foreign financial accounts held in the names of sham entities. Singenberger is a fugitive.

in, the Citaro accounts. Such records include Forms A identifying ROTTA as the beneficial owner of the assets in the Credit Suisse and Bank Julius Baer Citaro Accounts.

23.     Records produced by the SFTA reveal that, by 2001, ROTTA had over $19 million in net assets spread over the Citaro accounts at UBS, Credit Suisse, and Bank Julius Baer. The assets in those accounts generated substantial income each year, ranging from approximately $401,000 in 2001 to approximately $1,374,000 in 2003, which ROTTA used to fund his lifestyle in the United States. Indeed, ROTTA regularly directed transfers of large sums from the Citaro accounts to his domestic accounts:

| Transfer From | Transfer To | Date | Amount |
|---|---|---|---|
| UBS | Dan Rotta | March 13, 2001 | $600,000 |
| Credit Suisse | Dan Rotta | November 7, 2001 | $83,000 |
| Credit Suisse | Dan Rotta | February 7, 2002 | $400,000 |
| Bank Julius Baer | Dan Rotta | November 4, 2002 | $150,000 |
| Credit Suisse | Dan Rotta | February 19, 2003 | $350,000 |
| Bank Julius Baer | Dan Rotta | May 5, 2003 | $400,000 |
| | | **Total:** | **$1,983,000** |

24.     Records produced by the SFTA and records seized from ROTTA's residence show that, in or around spring 2003, ROTTA closed the accounts held in the name of Citaro at UBS, Credit Suisse, and Bank Julius Baer and transferred the assets to newly opened accounts at those banks held under the name of Sky Delta Limited ("Sky Delta"), a Hong Kong corporation.

25.     According to records produced by the SFTA and records seized from ROTTA's residence, Singenberger caused Sky Delta to be formed on or about March 5, 2003. Sky Delta's ownership structure mirrored Citaro's – the NAD Foundation held Sky Delta's shares in trust for ROTTA's benefit. Account files produced by the SFTA included Forms A executed in 2003 identifying ROTTA as the beneficial owner of the assets in the Sky Delta accounts at UBS, Credit Suisse, and Bank Julius Baer.

26.     According to records produced by the SFTA, between 2003 and 2008, the Sky Delta accounts at UBS, Credit Suisse, and Bank Julius Baer collectively held assets valued between $15 and $20 million that produced annual investment income that ranged from a low of approximately $1.3 million in 2006 to a high of approximately $1.6 million in 2007.

27.     ROTTA lacked formal signature authority over those accounts, but according to records produced by the SFTA and seized from his home, he regularly directed transfers of several hundred thousand dollars from the Sky Delta accounts either to his domestic accounts or to third parties for his benefit.

| Transfer From | Transfer To | Date | Amount |
|---|---|---|---|
| Credit Suisse | Dan Rotta | February 20, 2004 | $425,000 |
| Bank Julius Baer | Pevima Corporation[7] | May 17, 2004 | $115,000 |
| Credit Suisse | Dan Rotta | September 14, 2004 | $125,000 |
| Bank Julius Baer | Pevima Corporation | November 15, 2004 | $500,000 |
| Bank Julius Baer | Pevima Corporation | March 16, 2005 | $150,000 |
| Credit Suisse | Dan Rotta | May 9, 2005 | $500,000 |
| Bank Julius Baer | Pevima Corporation | February 15, 2006 | $290,000 |
| Bank Julius Baer | Pevima Corporation | March 16, 2006 | $285,000 |
| Credit Suisse | Pevima Corporation | May 18, 2006 | $100,000 |
| Credit Suisse | Pevima Corporation | August 10, 2006 | $500,000 |
| Bank Julius Baer | Pevima Corporation | January 22, 2007 | $500,000 |
| UBS | Pevima Corporation | April 19, 2007 | $200,000 |
| Credit Suisse | Pevima Corporation | August 29, 2007 | $500,000 |
| Bank Julius Baer | Pevima Corporation | January 9, 2008 | $300,000 |
| Credit Suisse | Dan Rotta | May 20, 2008 | $500,000 |
| Credit Suisse | Pevima Corporation | November 12, 2008 | $500,000 |
| Bank Julius Baer | Pevima Corporation | December 5, 2008 | $250,000 |
| Credit Suisse | Dan Rotta's Life Insurance Policy | April 2, 2009 | $614,069 |
| Bank Julius Baer | Pevima Corporation | April 6, 2009 | $300,000 |
| | | **Total:** | **$6,654,069** |

### ROTTA Changes Offshore Account Structure in Response to U.S. Investigation of Swiss Banks

28.     By May 2008, it was publicly reported that UBS and its bankers were under criminal investigation in the United States for helping U.S. taxpayers evade income taxes by concealing their accounts behind offshore corporate structures like Sky Delta. *See, e.g.,* Lynnley Browning, *UBS Banker Detained in Tax Inquiry*, N.Y. Times, May 7, 2008. At around that time, ROTTA began transferring assets from the UBS Sky Delta accounts to the Credit Suisse Sky Delta accounts. Records seized from ROTTA's residence suggest that ROTTA closely followed and kept news reports of the UBS investigation as it developed. For example, ROTTA

---

[7]   Pevima Corporation was a domestic nominee entity that ROTTA used to pay personal expenses. At the time it had no real business purpose, though ROTTA later used Pevima to invest in real estate.

saved a Wall Street Journal article reporting that a UBS senior executive had been indicted for tax evasion. *See* Evan Perez and Carrick Mollenkamp, *Top Banker Cited in Tax-Dodge Case*, Wall Street Journal, Nov. 13, 2008.

29.     Three weeks after that indictment, ROTTA established a relationship with a new Swiss bank, headquartered in Neuchâtel, Switzerland ("Swiss Bank 1"). According to records produced by the SFTA, ROTTA opened another Sky Delta account at Swiss Bank 1 on December 1, 2008. By February 2009, ROTTA successfully transferred all his remaining assets from the UBS Sky Delta accounts to the Swiss Bank 1 Sky Delta account. Swiss Bank 1 recorded on a Form A that ROTTA beneficially owned the assets in the Swiss Bank 1 Sky Delta account, and ROTTA, again, identified himself as a Brazilian citizen (and not a U.S. citizen) residing in Brazil on the Swiss Bank 1 Sky Delta account documents.

30.     On or February 18, 2009, UBS entered into a Deferred Prosecution Agreement with the United States in which it admitted that it conspired to defraud the United States. As part of the agreement, it agreed to immediately provide the United States government with the identities of, and account information for, certain United States customers. *See United States v. UBS*, 0:09-cr-60033-JIC (S.D. Fl.). It was widely reported that the disclosure of account information was an unprecedented, paradigm shifting event in Swiss banking that for decades, had shielded account information behind what, until then, had seemed an impregnable legal wall of secrecy. *See*, *e.g.*, Lynnley Browning, *A Swiss Bank Is Set to Open Its Secret Files*, New York Times, February 18, 2009, at A1; Evan Perez and Carrick Mollenkamp, *Swiss Bank to Give Up Depositors' Names to Prosecutors*, Wall Street Journal, February 19, 2009 (stating that "The agreement marks the first time Swiss financial regulators have allowed one of their banks to reveal the identity of account holders normally held secret under centuries of Swiss banking tradition.").

31.     Records seized from ROTTA's residence show that ROTTA saved a March 19, 2009, New York Times article that reported that federal authorities had expanded their investigation to include enablers, like Singenberger, who helped U.S. taxpayers to set up structures, like Citaro and Sky Delta, to evade their income taxes. *See* Lynnley Browning, *U.S. Extends Its Inquiry of Offshore Tax Fraud*, N.Y. Times, Mar. 18, 2009. Less than two weeks later, in an apparent effort to cut his relationship with Singenberger and his firm, ROTTA engaged a Swiss trust company affiliated with Swiss Bank 1 ("Swiss Trust Company") to create a new offshore structure to hold his assets.

32.     Records produced by the SFTA reveal that, to transition ROTTA's assets to the new structure, Swiss Trust Company arranged to transfer the assets in the Credit Suisse, Bank Julius Baer, and Swiss Bank 1 Sky Delta accounts to new accounts held in ROTTA's name at those banks. As a result, in April 2009, according to records produced by the SFTA, ROTTA closed the Credit Suisse, Bank Julius Baer, and Swiss Bank 1 Sky Delta accounts and directed that the assets be transferred to new accounts opened in his own name at those banks.

33.     According to records produced by the SFTA, ROTTA held accounts in his own name at Credit Suisse, Bank Julius Baer, and Swiss Bank 1 between April and September 2009. ROTTA was the account signatory and beneficial owner of the assets in his named accounts. ROTTA again identified himself as a Brazilian citizen and resident on the relevant account documents, and signed false certifications attesting that he was neither a U.S. citizen nor a person subject to United States income tax withholding requirements. By September 2009, ROTTA closed his named accounts at Credit Suisse, Bank Julius Baer, and Swiss Bank 1, and directed the transfer of the assets in those accounts to accounts at Credit Suisse and Swiss Bank 1 held in the name of Edelwiss Corporate Limited ("Edelwiss"), a new offshore nominee entity to be managed

12

by Swiss Trust Company.

34.    According to records produced by the SFTA and records seized from ROTTA's

residence, Edelwiss was a BVI corporation established by Swiss Trust Company in 2009. The

Putzo Foundation, a Lichtenstein Foundation established by Swiss Trust Company, held the shares

of Edelwiss for ROTTA's benefit. Despite the new structure, records produced by the SFTA and

seized from ROTTA's residence reveal that ROTTA was the beneficial owner of the assets in the

Edelwiss accounts, including Forms A executed in April 2009 that identified ROTTA as the

beneficial owner of those accounts. ROTTA continued to falsely identify himself solely as a

Brazilian national and resident on the relevant Edelwiss account documents and, therefore, not

subject to U.S. income tax withholding requirements.

35.    Records produced by the SFTA show that, between 2009 and 2011, the Edelwiss

accounts at Credit Suisse and Swiss Bank 1 collectively held assets valued between $15 and $20

million that produced annual income that ranged from a low of approximately $1.6 million in 2009

to a high of approximately $2 million in 2011. As with ROTTA's prior structures, the Edelwiss

accounts were formally managed by ROTTA's fiduciaries, Swiss Trust Company, while ROTTA

lacked formal signature authority over the accounts. Despite the appearance that ROTTA did not

have formal control over the accounts, the account files produced by the SFTA included email

communications demonstrating that ROTTA nevertheless directed Swiss Trust Company in the

disbursement of account assets. Indeed, between 2009 and 2011, ROTTA continued regularly

directing the transfer of millions of dollars from the Edelwiss accounts to his domestic accounts:

| Transfer From | Transfer To | Date | Amount |
|---|---|---|---|
| Swiss Bank 1 | Pevima Corporation | October 26, 2009 | $450,000 |
| Credit Suisse | Pevima Corporation | November 3, 2009 | $400,000 |
| Credit Suisse | Pevima Corporation | May 18, 2010 | $300,000 |
| Credit Suisse | Pevima Corporation | June 14, 2010 | $375,000 |
| Credit Suisse | Pevima Corporation | October 28, 2010 | $325,000 |
| Credit Suisse | Pevima Corporation | February 7, 2011 | $350,000 |
| Credit Suisse | Pevima Corporation | May 31, 2011 | $302,000 |
| Credit Suisse | Pevima Corporation | September 19, 2011 | $299,000 |
| | | Total: | $2,801,000 |

**ROTTA Changed his Offshore Accounts in 2011 in Response to an IRS Audit.**

36.     In or around July 2011, IRS records show that the IRS began an audit of ROTTA's half-brother based in part on documents that the IRS received from UBS revealing ROTTA's half-brother had signature authority over a safe deposit box account tied to ROTTA's UBS Vima account. On or about August 4, 2011, an IRS Revenue Agent interviewed ROTTA's half-brother, who denied owning any foreign bank accounts or entities. Shortly thereafter, in or around September 2011, the Revenue Agent closed the audit of ROTTA's half-brother and referred ROTTA for audit as the true owner of the assets in the UBS Vima account.

37.     Not long after the IRS interviewed ROTTA's half-brother, ROTTA took several steps to erase evidence of his ownership of the assets in the Edelwiss accounts, in an apparent effort to further conceal his foreign accounts from the IRS in anticipation of an audit.

38.     According to records produced by the SFTA and records seized from ROTTA's residence, ROTTA enlisted CO-CONSPIRATOR 1, his longtime friend and cousin, to serve as the nominee owner of the Edelwiss accounts. CO-CONSPIRATOR 1 was a Brazilian citizen who lived in Brazil and would not be subject to U.S. tax withholding or reporting requirements.

39.     Between October and November 2011, ROTTA worked with Swiss Trust Company and CO-CONSPIRATOR 1 to create a new structure, the Putzo Settlement, that would make it appear, on paper, that CO-CONSPIRATOR 1 was the beneficial owner of the assets in the

Edelwiss accounts. The Putzo Settlement was a Liechtenstein trust nominally settled by CO-CONSPIRATOR 1 to hold the shares of Edelwiss for the benefit of ROTTA and his family. ROTTA was named the "protector" of the Putzo Settlement, which allowed ROTTA to maintain control over the accounts without expressly being named as a beneficiary. As a result, both Credit Suisse and Swiss Bank 1 recorded CO-CONSPIRATOR 1 as the beneficial owner of the assets in the Edelwiss accounts on updated Forms A executed on or around November 10, 2011.

40.     By the time the IRS formally began its audit of ROTTA, he had changed Edelwiss' ownership structure to make it appear that CO-CONSPIRATOR 1 owned the assets in the Edelwiss accounts rather than ROTTA. However, records produced by the SFTA demonstrate this was a sham: ROTTA directed the formation of the Putzo Settlement and structured it to continue to benefit him, his friends, and heirs. ROTTA also maintained dominion and control over the assets in the Edelwiss accounts at Swiss Bank 1 and Credit Suisse, and he continued to direct the investment of his assets and their distribution for his own benefit. For example, ROTTA directed or caused the following transfers for his benefit in 2012, after CO-CONSPIRATOR 1 became the nominal owner of the Edelwiss accounts:

| Transfer From | Transfer To | Date | Amount |
|---------------|-------------|------|--------|
| Credit Suisse | Pevima Corporation | January 30, 2012 | $301,000 |
| Credit Suisse | Pevima Corporation | May 21, 2012 | $300,000 |
| | | **Total:** | **$601,000** |

### The IRS Audit of ROTTA

41.     In or around 2011, the IRS commenced an audit of ROTTA to determine whether he had any unreported foreign financial accounts. As explained more fully below, in response to the audit, ROTTA falsely denied having unreported foreign accounts or income and conspired with CO-CONSPIRATOR 1 and others to obstruct the audit by providing false documents to the IRS to conceal his offshore accounts.

15

42.     IRS records show that, on or about December 6, 2011, an IRS Revenue Agent spoke with ROTTA and his return preparer regarding an audit of ROTTA's individual income taxes for 2008 through 2011. The primary focus of the audit was to determine whether ROTTA had outstanding tax liabilities from unreported assets and income in foreign bank accounts.

43.     ROTTA responded to the audit by falsely denying that he had any foreign bank accounts. IRS records reveal that ROTTA was initially represented in the audit by his then-accountant ("Accountant 1"). An IRS Revenue Agent interviewed Accountant 1 on or about May 4, 2012, and ROTTA participated via telephone. During the interview, ROTTA claimed not to have any foreign bank accounts or foreign business activity of any kind. When given an opportunity to clarify, ROTTA persisted, assuring the Revenue Agent he had no foreign investments or business activity.

44.     According to IRS records, the Revenue Agent informed Accountant 1 that the IRS had received evidence that ROTTA had foreign accounts. After conferring with ROTTA privately, Accountant 1 told the Revenue Agent that ROTTA insisted that he did not have foreign accounts of any kind.

45.     IRS records demonstrate that ROTTA persisted with his false claims during his second meeting with the IRS, which occurred on or about May 18, 2012. When asked, ROTTA again denied having either a foreign bank account or foreign investments of any kind, though this time ROTTA clarified that he owned a candy company in Brazil and a watch business in Hong Kong in the 1990s. During the second meeting, the Revenue Agent specifically asked ROTTA about Vima, and ROTTA explained that Vima had not been in business for many years because it was replaced by Pevima. He again falsely denied ever having an account or investments at UBS or any other bank in Switzerland.

46.     In October 2012, ROTTA hired an attorney to represent him during the IRS audit ("Attorney 1"). Through Attorney 1, ROTTA continued to falsely claim that he did not have any foreign bank accounts. For example, an IRS Revenue Agent met with Attorney 1 on November 19, 2012, and Attorney 1 falsely represented that ROTTA did not have any foreign bank accounts and was not responsible for filing any foreign returns or documentation.

47.     An IRS Revenue Agent again met with Attorney 1 and ROTTA on November 29, 2012. During that second meeting, ROTTA once more falsely denied ever having any foreign bank accounts in his own name or in the name of entities he controlled. ROTTA also falsely told the Revenue Agent that he did not have a safe deposit box in 2008 (the year under audit) or at the time of the interview, in 2012. Records produced by the SFTA demonstrate this was false – ROTTA had a safe deposit box for the UBS Sky Delta account in 2008 and had a safe deposit box in his own name at Credit Suisse between 2009 and 2014.

48.     By the time the IRS Revenue Agent met with Attorney 1 and ROTTA in November 2012, IRS records indicate the IRS had already obtained copies of ROTTA's domestic bank records via summons, which revealed that ROTTA regularly received transfers of several hundred thousand dollars from his foreign accounts during the years under audit. According to the Revenue Agent's notes of the meeting, she confronted Attorney 1 with the fact that ROTTA received $1,450,000 from Sky Delta accounts at several different Swiss banks and asked him to explain the source of funds. In response, ROTTA falsely claimed, through Attorney 1, that the money he received in 2008 from Sky Delta was a loan.

49.     According to the Revenue Agent's memorandum, Attorney 1 claimed that ROTTA lived off a $1,450,000 loan which he borrowed from two friends who were non-U.S. persons. Attorney 1 elaborated that the loan proceeds were transferred to Pevima's checking account

through a Hong Kong Company called Sky Delta Limited. The Revenue Agent recorded in her memorandum that ROTTA maintained he had no interest in Sky Delta and claimed that he, in fact, owed the money to his two friends. This was false. As set forth above, ROTTA was the beneficial owner of the assets in the Sky Delta accounts.

50.     IRS records show that, thereafter, on ROTTA's behalf, Attorney 1 presented the IRS with false documents to support the fabricated assertion that the funds received in 2008 from the Sky Delta accounts were a loan, allegedly received from two individuals who were Romanian nationals and citizens and residents of France (hereinafter, the "French Family Friends"). Attorney 1 gave the IRS a copy of a promissory note purportedly evidencing the loan. The promissory note was accompanied by letters seemingly intended to bolster its legitimacy, including a letter from another attorney ("Attorney 2"); a letter from the son-in-law and purported successor in interest to the French Family Friends, who had allegedly provided the loan ("Co-Conspirator 2"); and a letter from CO-CONSPIRATOR 1. Each of these individuals claimed to have maintained copies of the promissory note and to have provided it to ROTTA upon request.

51.     IRS records show that the IRS Revenue Agent handling the audit subsequently inquired about additional transfers ROTTA received from Sky Delta, which totaled $850,000 in 2009, and from Edelwiss, which totaled $2,801,000 between 2009 and 2011. In response, Attorney 1 presented additional false promissory notes and letters from Co-Conspirator 2 and CO-CONSPIRATOR 1 indicating they had found those notes among their records.

52.     At the time of the audit, the IRS did not possess any of the Sky Delta or Edelwiss account files. However, the IRS has since received those account files, and those records make clear that ROTTA was the beneficial owner of the assets in the Sky Delta and Edelwiss accounts. Therefore, the funds ROTTA received from those accounts were not loan proceeds, as claimed in

the documents Attorney 1 provided to the IRS.

53.     IRS records and records produced by Attorney 1's law firm also demonstrate that ROTTA caused Attorney 1 to falsely deny that ROTTA had any knowledge of, or interest in, Vima. For example, in an August 2, 2013, letter to the IRS Revenue Agent handling the audit, Attorney 1 represented: "Mr. ROTTA has advised you that he has no knowledge of any corporation with the name 'Vima[;]' he does not have, and has never had, any interest in a corporation incorporated in Liberia and does not have, and has never had, an interest in a financial account at UBS in Switzerland." In fact, ROTTA directed the formation of Vima as a Liberian corporation to serve as the nominee owner of the assets held in accounts at UBS and Credit Suisse. Records recovered during the execution of a search warrant at ROTTA's residence in June 2021 evidence ROTTA's ownership and control of Vima and its accounts. These records included a copy of a March 16, 1989, instruction signed by ROTTA, which directed UBS to form Vima, Inc. as a Liberian company, to make ROTTA the director and president of Vima, and to open accounts in Vima's name at UBS and Credit Suisse. They also included a copy of a Form A for the UBS Vima account, which documented ROTTA's beneficial ownership of the assets in that account.

54.     Elsewhere, Attorney 1 also repeated ROTTA's false assertions that he did not have foreign bank accounts. Attorney 1's law firm produced a November 6, 2013, letter from Attorney 1 to the IRS Revenue Agent handling the audit that stated: "As you were previously advised the taxpayer does not and did not have a financial interest in or signature authority, over foreign financial accounts during the years 2008 through 2011. Accordingly, the taxpayer is unable to provide any documents in response to the request." This was false; records produced by the SFTA show that ROTTA was, in fact, the beneficial owner of seven bank accounts in the name of Sky Delta at four separate Swiss banks, three accounts in his own name at three separate Swiss banks,

two accounts in the name of Edelwiss at two separate Swiss banks, and a safe deposit box account in his own name at Credit Suisse, all between 2008 and 2011. Moreover, records seized from ROTTA's home during the execution of a search warrant reveal that ROTTA maintained extensive records related to these accounts, contrary to Attorney 1's representation on ROTTA's behalf.

55.     On or about June 24, 2014, the IRS concluded the audit of the 2008-2010 tax years by issuing ROTTA a Notice of Deficiency in which it proposed income tax deficiencies and penalties for the following years in the following amounts:

| Year | Deficiency | Penalty – I.R.C. 6663(a) |
|------|------------|--------------------------|
| 2008 | $549,601.00 | $412,200.75 |
| 2009 | $481,918.00 | $361,438.50 |
| 2010 | $318,499.00 | $238,874.25 |

56.     The deficiencies assessed for 2008, 2009, 2010 were based in part on the IRS rejecting ROTTA's claims that money received from Sky Delta and Edelwiss were loans and instead finding that ROTTA received "other income" from these entities in the following amounts:

| Year | Income Received | Entity Received From |
|------|-----------------|----------------------|
| 2008 | $1,949,975 | Sky Delta |
| 2009 | $1,700,000 | Sky Delta and Edelwiss |
| 2010 | $1,149,000 | Edelwiss |

57.     In or around June 2014, ROTTA hired another lawyer ("Attorney 3") to represent him in his ongoing IRS audit, according to records produced by Attorney 3's law firm. Attorney 3, assisted by his colleagues, including a trusts and estates attorney who had previously worked for ROTTA ("Attorney 4"), drafted a Tax Court petition on ROTTA's behalf.

58.     On or about September 24, 2014, ROTTA, through Attorney 3, filed the petition in Tax Court to contest the IRS's audit determinations of tax deficiencies for tax years 2008, 2009,

and 2010.[8] In the petition, Attorney 3 repeated ROTTA's false assertions that he did not have any foreign bank accounts and that the funds he received from Sky Delta and Edelwiss were loans.

59.     ROTTA's Tax Court petition claimed that, in 2008, ROTTA "asked long-time family friends . . . for loans;" that the French Family Friends agreed to advance him funds; and that the money would be repaid when ROTTA sold real property he owned in Oyster Bay, New York. According to the petition, the French Family Friends "chose to have the loans made by Sky Delta, Ltd., a Hong Kong Company." In total, the petition claimed that, through Sky Delta, the French Family Friends had advanced ROTTA $1.45 million (plus interest) in 2008 and $850,000 (plus interest) in 2009. In support of these claims, Attorney 3 attached as exhibits to ROTTA's petition "Promissory Notes" purportedly executed by ROTTA in favor of the French Family Friends "in the form in which it was presented to him."

60.     In the petition, ROTTA further claimed that the funds he received from Edelwiss in tax years 2009 and 2010 were loans from his cousin, CO-CONSPIRATOR 1. Specifically, the petition claimed that in 2009, after the French Family Friends died, ROTTA approached CO-CONSPIRATOR 1 for a loan, and CO-CONSPIRATOR 1 agreed to lend him $850,000, which was disbursed in two payments through Edelwiss. CO-CONSPIRATOR 1 then advanced an additional $1,000,000 in 2010 through Edelwiss. The petition claimed that CO-CONSPIRATOR 1, like the French Family Friends, expected repayment after ROTTA sold his Oyster Bay home. Finally, the petition claimed that ROTTA signed promissory notes in favor of Edelwiss to repay these loans.

61.     In the petition, ROTTA falsely claimed that there were no deficiencies for the relevant years and alleged that the French Family Friends owned the assets in the Sky Delta

---

[8]     *See ROTTA v. Commissioner of Internal Revenue*, Docket No. 22836-14.

accounts and CO-CONSPIRATOR 1 owned the assets in the Edelwiss accounts. This was false: ROTTA was the true beneficial owner of the assets in the Sky Delta accounts and the Edelwiss accounts.

### ROTTA Conspired with CO-CONSPIRATOR 1 and Others to Bring Funds Onshore During his Audit

62.     While the IRS audit and Tax Court litigation were ongoing—ROTTA maintained between $15 and $20 million in assets in the Credit Suisse and Swiss Bank 1 Edelwiss accounts. Records produced by the SFTA demonstrate that ROTTA continued to actively manage the investments of those accounts and continued to direct transfers from the Edelwiss accounts for his own benefit. However, in a likely effort to obscure his use of the funds while he was under audit, records produced by the SFTA and domestic bank records demonstrate that ROTTA began routing his transfers through U.S.-based accounts in the names of CO-CONSPIRATOR 1 and others.

63.     For example, domestic bank records and records produced by the law firm of ROTTA's longtime lawyer and friend ("Attorney 5") demonstrate that ROTTA worked with Attorney 5 to pass money through a domestic bank account held in CO-CONSPIRATOR 1's name. Bank records show that in around September 2012, a domestic Citibank account was opened in CO-CONSPIRATOR 1's name ("the CO-CONSPIRATOR 1 Citibank account"), and that in May 2015, Attorney 5 became an authorized signer on the CO-CONSPIRATOR 1 Citibank account.

64.     Records seized from ROTTA's email and residence suggest the CO-CONSPIRATOR 1 Citibank account was a nominee account under ROTTA's dominion and control, and that ROTTA used Attorney 5 at times to control the CO-CONSPIRATOR 1 Citibank account. For example, ROTTA maintained a document containing account information for the CO-CONSPIRATOR 1 Citibank account, including login information for online banking; debit card numbers, expiration dates, and security codes; wire instructions for the account; and answers

to the account's security questions. Your Affiant notes that the username and password for the CO-CONSPIRATOR 1 Citibank account includes information personal to ROTTA, rather than CO-CONSPIRATOR 1.

65.     Domestic bank records and records produced by the SFTA demonstrate that ROTTA used the CO-CONSPIRATOR 1 Citibank account as a passthrough to obscure his transfers from the Credit Suisse and Swiss Bank 1 Edelwiss accounts. Between November 2012 and March 2016, the CO-CONSPIRATOR 1 Citibank account received 10 wire transfers totaling just over $3.7 million from the Edelwiss accounts, almost all of which was then transferred to ROTTA's domestic accounts or to third parties as payments for ROTTA's benefit. Records produced by Attorney 5's law firm show that, at times, ROTTA directed Attorney 5 to make transfers from the CO-CONSPIRATOR 1 Citibank account for ROTTA's benefit.

66.     Records produced by the SFTA also demonstrate that ROTTA directed transfers from the Edelwiss accounts through attorney trust accounts belonging to Attorney 2 and Attorney 5. In total, between on or about March 2014 and October 2016, ROTTA directed seven wire transfers totaling $614,500 from the Edelwiss accounts to Attorney 2's attorney trust account.

67.     For example, in or around July 2016, ROTTA transferred $75,000 from the Credit Suisse Edelwiss account to Attorney 2's trust account. Records seized during the search warrant demonstrate that, shortly thereafter, ROTTA, directed Attorney 2 via email to transfer $75,000 from Attorney 2's trust account to a car dealership in the Miami area. Based on the records seized during the search warrant, ROTTA used this money to purchase a new Porsche 911 Targa.

68.     Records produced by the SFTA also demonstrate that ROTTA directed transfers from his offshore accounts to domestic accounts held in the name of various trusts, including The Sergio 2014 Trust. The Sergio 2014 Trust was a trust purportedly settled by CO-CONSPIRATOR

1 in 2014 for the benefit of ROTTA and his son. Domestic bank records and records produced by the SFTA reveal that the trust was in fact funded by transfers from the Edelwiss accounts at ROTTA's direction, and ROTTA proceeded to use the funds for his own benefit.

### ROTTA and CO-CONSPIRATOR 1 Conspired to Obstruct the IRS by Presenting False and Misleading Documents to the IRS During United States Tax Court Litigation.

69.   In approximately June 2015, another attorney ("Attorney 7"), began representing ROTTA in the Tax Court litigation as well as the audit of the tax years 2011 through 2013. As part of that litigation, Attorney 7 provided the IRS with an affidavit from CO-CONSPIRATOR 1 and a declaration from Co-Conspirator 2, which perpetuated the false narrative that the funds ROTTA received from the Edelwiss account were loans.

70.   Records obtained from the IRS, show that, in or around July and August 2016, CO-CONSPIRATOR 1 and Co-Conspirator 2 sat for interviews with counsel for the IRS regarding the "loans" ROTTA purportedly received from the Sky Delta and Edelwiss accounts. CO-CONSPIRATOR 1 falsely represented that he owned Edelwiss; that he extended loans to ROTTA based on their close personal relationship; and that ROTTA would repay the loans made through both Sky Delta and Edelwiss. Co-Conspirator 2 falsely represented that the French Family Friends had a close and long-standing personal relationship with ROTTA; that the funds transferred through Sky Delta to ROTTA were bona fide loans from the French Family Friends; and that the loans remained outstanding obligations, which Co-Conspirator 2 expected ROTTA to repay.

71.   Records seized from ROTTA's residence indicate that in December 2016, ROTTA finalized the sale of his property in Oyster Bay, New York for approximately $6,280,000. Bank records show that ROTTA deposited the proceeds of the sale – approximately $5,916,114 – into his personal Citibank account.

72.   Records obtained from domestic financial institutions show that, on or about

January 17, 2017 – approximately 40 days after closing – ROTTA wrote a $4.4 million check to CO-CONSPIRATOR 1 and a $750,000 check to Co-Conspirator 2. In the memo lines of the checks, ROTTA noted that they were "payment of loan as per agreement." Based on IRS records, Attorney 7 presented these checks to the IRS as proof that the payments ROTTA received from Sky Delta and Edelwiss were loans, which had been satisfied.

73.     According to IRS personnel, on or about February 8, 2017, the IRS consented to settle the Tax Court litigation with ROTTA and to agree that ROTTA owed neither additional income tax nor penalties for 2008 through 2010. The IRS reached this decision based, at least in part, on the interviews of Co-Conspirator 2 and CO-CONSPIRATOR 1, the alleged loan documents, and the purported evidence of loan repayment.

74.     On or about March 10, 2017, the IRS also agreed to settle ROTTA's 2011 through 2013 audit, which was on appeal with the IRS. For the same reasons as in the Tax Court case, based upon the fraudulent documents and false testimony it received, the IRS agreed that ROTTA owed no additional income tax or penalties for 2011 through 2013.

75.     However, bank records obtained in the instant investigation demonstrate that the purported repayments were a sham: the "repayments" were returned to ROTTA within months of the closure of the IRS audit, as demonstrated below:

a.     Between on or about January 25, 2017, and May 1, 2017, checks totaling $4.4 million – equal to the full amount of ROTTA's purported repayment – were written from a Regions Bank account held in CO-CONSPIRATOR 1's name and deposited into The Sergio 2014 Trust account at Morgan Stanley. Again, The Sergio 2014 Trust was a domestic trust purportedly settled by CO-CONSPIRATOR 1, and ROTTA and his son were the expressly named beneficiaries of the trust. Thus, ROTTA actually retained

ownership and control over the $4.4 million "repayment" to CO-CONSPIRATOR 1.

b.      On or about January 27, 2017, ten days after ROTTA's purported repayment of the $750,000 loan was deposited into Co-Conspirator 2's Citibank account, a check payable to CO-CONSPIRATOR 1 in the amount of $750,000 was issued from Co-Conspirator 2's Citibank account. That check was deposited into the CO-CONSPIRATOR 1 Citibank account on or about February 1, 2017.

c.      Within a week of the $750,000 deposit to CO-CONSPIRATOR 1's Citibank account, a total of $750,000 was wired from the account to two separate accounts held in the name of The Sergio 2014 Trust. Therefore, ROTTA likewise retained ownership and control over the $750,000 "repayment" to Co-Conspirator 2.

### ROTTA Conspired with CO-CONSPIRATOR 1 to Create
### Sham Trust Structures to Continue Evading Taxes

76.      In or around November 2016, ROTTA began closing the Edelwiss accounts and transferring the assets to accounts held in the name of The Majestic Trust at another Swiss financial institution headquartered in Zurich, Switzerland ("Swiss Bank 2").

77.      According to nonprivileged records produced by Attorney 5's law firm, CO-CONSPIRATOR 1 purportedly settled the Majestic Trust with the help of Attorney 5 in or around October 2015. The Majestic Trust was a Florida trust much like The Sergio 2014 Trust, and, according to the original trust instrument, ROTTA was entitled to the net income of the trust along with his son. The trustees were also given the authority to distribute the trust principal to ROTTA and his son.[9]

78.      The SFTA produced account files for Swiss Bank 2 accounts held in the name of

---

[9]      Based on The Majestic Trust records, The Majestic Trust was amended in or around January of 2018 to add CO-CONSPIRATOR 1 as a discretionary beneficiary of the trust.

The Majestic Trust. Attorney 5 opened the Swiss Bank 2 accounts on or about November 14, 2016, and the Swiss Bank 2 account files included a Form T, Declaration of Trusts, that declared CO-CONSPIRATOR 1 as the settlor of the trust and ROTTA and his son as trust beneficiaries. The Swiss Bank 2 account files also included U.S. Tax Status Declaration forms that properly identified ROTTA and his son as United States citizens.

79.     The Swiss Bank 2 account records demonstrate these accounts were structured to make it appear, on paper, that CO-CONSPIRATOR 1 funded the accounts as the settlor of The Majestic Trust. However, ROTTA was the actual beneficial owner of the assets in the Edelwiss accounts and had been the owner of those same assets as they flowed from one Swiss bank account to another over approximately three decades. To further minimize his tax obligations, ROTTA falsely claimed that a portion of the Majestic Trust's income each year was distributed to CO-CONSPIRATOR 1, thereby lowering ROTTA's share of the trust's overall income.

80.     Nonprivileged records produced by Attorney 5's law firm show that, despite ROTTA's limited documented authority over the Swiss Bank 2 accounts, he continued to actively manage and exercise dominion and control over the accounts. For example, copies of email exchanges suggest that ROTTA was integral to the opening of the Swiss Bank 2 accounts, and that ROTTA managed the assets in the Swiss Bank 2 accounts through Attorney 5. And, in or around May 2017, ROTTA emailed instructions to the Swiss external asset management firm hired by the trust to direct that certain securities be registered The Majestic Trust. Attorney 5, who was copied on the email, replied to ROTTA to ask whether ROTTA wanted Attorney 5 to do anything. ROTTA responded by indicating that the Swiss external asset manager should tell Attorney 5 what, if anything, he needed him to do to comply with ROTTA's direction.

81.     As another example, records produced by Attorney 5's law firm show that in or around May 2018, ROTTA emailed Attorney 5 a draft instruction to transfer 20,000 Swiss Francs from the Swiss Bank 2 accounts to ROTTA's Swiss counsel. In the email, ROTTA stated "Please sign the attached transfer and email it to [the Swiss external asset manager] and copy to me." Shortly thereafter, Attorney 5 sent an executed instruction to the Swiss external asset manager, copying ROTTA.

82.     Records obtained by the IRS show that ROTTA also continued to use domestic accounts under his control to obscure his receipt of funds from his offshore accounts. For example, on or about November 27, 2018, ROTTA directly emailed an instruction that had been signed by Attorney 5 to his Swiss external asset manager, instructing Swiss Bank 2 to transfer $600,000 on or about January 2, 2019, to the CO-CONSPIRATOR 1 Citibank account, the nominee account under ROTTA's control. ROTTA copied Attorney 5 on the email. On or about January 16, 2019, ROTTA sent Attorney 5 a second instruction directing Swiss Bank 2 to transfer another $650,000 on or about February 27, 2019, to CO-CONSPIRATOR 1's Citibank account. Records obtained from Citibank reveal that, shortly after both transfers, over $1,000,000 of the funds were transferred from CO-CONSPIRATOR 1's Citibank account to an attorney trust account of Attorney 5's firm. Records produced by Attorney 5's firm included a ledger for the trust account into which the funds were deposited, which suggest the account is held in trust for ROTTA.

83.     In like manner, according to records produced by Attorney 5's firm, on or about June 18, 2019, ROTTA emailed Attorney 5 a draft instruction to transfer $490,000 from the Swiss Bank 2 account to a domestic account at Morgan Stanley held in the name of The Majestic Trust. ROTTA's email to Attorney 5 requested that he "please sign the attached transfer" and email it to the Swiss external asset managers. Attorney 5 sent the Swiss external asset managers executed the

28

transfer instruction shortly thereafter.

84.     According to records produced by the SFTA and Attorney 5's law firm, ROTTA caused the closure of the Swiss Bank 2 accounts in or around 2019, directing the money to be transferred to domestic accounts held in The Majestic Trust's name. ROTTA emailed Attorney 5 draft closing instructions in or around December 10, 2019. The next day, Attorney 5 sent the executed closing instructions to Swiss Bank 2, copying ROTTA. Ultimately, bank records confirm the funds were transferred to an account held in The Majestic Trust's name at JP Morgan Chase.

### ROTTA Filed a False Voluntary Disclosure

85.     Based on records produced by the SFTA, ROTTA was aware by 2019 that certain of his account records were going to be disclosed to the IRS as part of the Swiss banks' agreements with the United States. ROTTA was likely aware that if those records were disclosed to the IRS, it would reveal that he, CO-CONSPIRATOR 1, and others had defrauded the IRS during his audit.

86.     So, shortly thereafter, ROTTA engaged U.S. counsel and attempted to make a voluntary disclosure to the IRS to limit his exposure to criminal prosecution while simultaneously and fraudulently attempting to limit the amount of penalties he would pay to the IRS. At that time, under the IRS's Voluntary Disclosure Practice, certain taxpayers who committed tax or tax-related crimes and had criminal exposure due to their willful violation of the law could seek to limit their exposure to criminal prosecution and resolve their civil non-compliance liabilities by making a timely, accurate, and complete voluntary disclosure of their conduct. Among other things, taxpayers who willfully failed to report their foreign bank accounts could be subject to a penalty of 50% of the highest year's unreported balance. In ROTTA's case, if he had accurately disclosed his foreign accounts, he could have been subject to a penalty of approximately $10,000,000.

87.     However, as explained more fully below, ROTTA submitted a false voluntary disclosure application, in which he disclosed his interest in the Edelwiss accounts, but falsely

claimed that only $2 million of the assets belonged to him, while the rest belonged to CO-CONSPIRATOR 1. This was false, and a likely attempt to evade paying the 50% penalty on the full value of his unreported Swiss accounts.

88.     On or about July 9, 2019, ROTTA submitted to the IRS Part I of Form 14457, Voluntary Disclosure Practice Preclearance Request and Application ("Voluntary Disclosure Application"). In that application, ROTTA admitted that he owned, controlled, or was the beneficial owner of the Edelwiss accounts at Credit Suisse and Swiss Bank 1. Taxpayers could not participate if the IRS previously received information from a third party (such as a foreign bank or the SFTA) regarding a taxpayer's noncompliance.

89.     IRS records show that, at the time that ROTTA submitted Part I of his Voluntary Disclosure Application to the IRS, the IRS had requested but not yet received the Swiss Bank 1 Edelwiss account file, which ROTTA likely knew existed (indeed, he had attempted to prevent the IRS from obtaining those records). Consequently, the IRS granted ROTTA's preclearance request and preliminarily accepted him into the voluntary disclosure program.

90.     IRS records show that, on or about November 8, 2019, ROTTA, submitted to the IRS Part II of his Voluntary Disclosure Application, which he signed under penalties of perjury. ROTTA checked "no" in answer to Question 7 on Part II of the Voluntary Disclosure Application, which asked whether "anyone, including a foreign government or a foreign financial institution, advised you that your offshore account records, which are the subject of this voluntary disclosure, were susceptible to being turned over to the U.S. government pursuant to an official request." This was false. ROTTA had in fact been notified via email that Swiss Bank 1 received a request from the U.S. Department of Justice to produce records related to the Edelwiss account.

91.     Part II of ROTTA's Voluntary Disclosure Application also purported to explain the

source of funds in the Swiss Bank 1 and Credit Suisse Edelwiss accounts and ROTTA's control over those funds. In his submission, ROTTA admitted, for the first time, that he had owned and controlled Swiss bank accounts since the 1990s, but claimed that most of the assets in the Edelwiss accounts—approximately $13 million—came from CO-CONSPIRATOR 1's father, to be held in trust for CO-CONSPIRATOR 1. ROTTA claimed that $2 million in the accounts belonged to him, which he received in a payment from his first wife's father. This was also false. In fact, the money that funded the Edelwiss accounts came from foreign financial accounts that ROTTA had owned and controlled since at least 1985.

92.     According to Part II of ROTTA's Voluntary Disclosure Application, ROTTA attempted to explain why CO-CONSPIRATOR 1's funds had ultimately been placed in a trust for ROTTA and his son's benefit, explaining that it was understood that when he and CO-CONSPIRATOR 1 died, all the remaining funds would pass to ROTTA's son because CO-CONSPIRATOR 1 had no children. This was also false. Multiple witnesses have testified before the grand jury that CO-CONSPIRATOR 1 has a wife and two adult children, one son and one daughter.

93.     ROTTA also falsely claimed, in Part II of his Voluntary Disclosure Application, to have made efforts, since 2011, to become compliant with his U.S. tax and reporting obligations but asserted that he was never properly advised as to how to accomplish this. ROTTA's submission noted his involvement in an IRS audit and Tax Court litigation, which took place during that time, but misleadingly indicated that these were "resolved very favorably for the taxpayer, with no assessment of additional tax or penalties." ROTTA's submission failed to note that he had repeatedly lied to the IRS during the audit and Tax Court litigation by denying his ownership and control of foreign financial accounts, by disclaiming possession of records relating to those

accounts, and by falsely claiming that the funds he received from Sky Delta and Edelwiss were loans from the French Family Friends and CO-CONSPIRATOR 1.

### Conclusion

94. Based on the foregoing facts, I submit that probable cause exists to conclude that: (1) between in or around 2011 and the present, in or around Miami, Florida, within the Southern District of Florida, ROTTA conspired with CO-CONSPIRATOR 1 and others, known and unknown, to defraud the United States by impeding, impairing, obstructing, and defeating the lawful government functions of the Internal Revenue Service of the United States Department of Treasury in the ascertainment, computation, assessment, and collection of ROTTA's federal income taxes, in violation of 18 U.S.C. § 371; and (2) ROTTA knowingly and willfully made and caused to be made materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of the executive, legislative, or judicial branch of the government of the United States by, submitting a materially false voluntary disclosure application to the IRS on or about November 8, 2019, in the Southern District of Florida, in violation of 18 U.S.C. § 1001(a)(3).

FURTHER AFFIANT SAYETH NAUGHT.

JAMES O'LEARY
SPECIAL AGENT
IRS CRIMINAL INVESTIGATIONS

Attested to by the applicant in accordance with the requirements of Fed.R.Crim.P. 4.1 by Face Time this ___8th___ day of March 2024.

HONORABLE LISETTE M. REID
UNITED STATES MAGISTRATE JUDGE

32