## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF FLORIDA

Case No. 1:24-cr-20113(s)-Smith

UNITED STATES OF AMERICA

v.

DAN ROTTA,

Defendant.

## FACTUAL BASIS

The defendant, DAN ROTTA ("ROTTA"), agrees that had this matter proceeded to trial, the government would have been able to prove the following facts beyond a reasonable doubt. The parties agree that these facts are sufficient to establish a factual basis for the defendant's plea, pursuant to Fed. R. Crim. P. 11(b)(3).

1. ROTTA was a naturalized United States citizen who, for decades, concealed millions of dollars in assets and income from the Internal Revenue Service ("IRS") in Swiss bank accounts that he failed to report either on his tax returns or on reports of foreign bank and financial accounts. At times, the total value of ROTTA's unreported foreign assets reached approximately $20 million, and, between 2001 and 2020, ROTTA's investments generated tens of millions of dollars in unreported income. His conduct caused a significant tax loss to the United States.

2. Over the years, ROTTA conspired with his longtime friend and Brazilian citizen, SERGIO CERNEA ("CERNEA"), among others, to defraud the United States by concealing ROTTA's offshore assets and income from the IRS. ROTTA, CERNEA, and others: (i) obstructed an

IRS audit by falsely denying that ROTTA had any foreign bank or financial accounts; (ii) listed CERNEA as the nominee owner of ROTTA's Swiss bank accounts; (iii) provided, and caused others to provide, false documents to the IRS; (iv) filed a false and fraudulent petition in the United States Tax Court; (v) created sham trust structures designed to conceal ROTTA's assets and income; and (vi) filed false tax returns that substantially underreported ROTTA's income. When it became evident that Swiss banks were cooperating with the United States and ROTTA could no longer hide his foreign financial accounts from U.S. authorities, ROTTA submitted a false application to the IRS's Voluntary Disclosure Practice, in which he admitted he had foreign financial accounts, but falsely claimed most of the assets in those accounts belonged to CERNEA to limit his exposure to tax penalties.

3.      ROTTA, a retired businessman, moved to Fisher Island, Florida, in 2001. Prior to retirement, ROTTA ran import and export businesses in New York, including a watch and jewelry business, and an electrical distribution company. During that time, ROTTA resided in New York at multiple residences, including on Park Avenue and East End Avenue in Manhattan, and in Oyster Bay, Long Island, New York.

4.      U.S. citizens and residents who received income exceeding a threshold amount in any one calendar year were required to file a Form 1040, U.S. Individual Income Tax Return ("Form 1040"), for that calendar year with IRS by on or around April 15 of the following year. On that tax return, U.S. taxpayers were obligated to report their worldwide income, including all income earned from assets in foreign financial accounts (such as bank, brokerage, and securities accounts), among other types of income.

5.      U.S. taxpayers also had an obligation to report to the IRS on Schedule B, "Interest and Ordinary Dividends" ("Schedule B") of their Form 1040 whether they had a financial interest

2

in, or signature authority over, a financial account located in a foreign country in a particular year by checking either "Yes" or "No" in the appropriate box, and by identifying the appropriate countries where the foreign financial account(s) were maintained.

6.     In addition, U.S. taxpayers who had a financial interest in, or signature authority over, one or more financial accounts in a foreign country with an aggregate value of all such foreign financial accounts of more than $10,000 at any time during a particular year, were required to file with the U.S. Department of Treasury a Report of Foreign Bank and Financial Accounts ("FBAR"), using Form TD-F 90-22.1 prior to January 1, 2013, and, after January 1, 2013, the renamed FinCEN Form 114. On an FBAR, a taxpayer was required to disclose, among other things, the name of each financial institution at which each account was held, the account numbers, and the maximum value of each account during the calendar year. For calendar years up through 2015, the filing deadline for an FBAR was on or about June 30 of the following year. For calendar years 2016 forward, the filing deadline for an FBAR was on or about April 15 of the following year, though filers failing to meet the FBAR annual due date of April 15 were granted an automatic extension to October 15 each year.

7.     Article 27 of the Agreement on the Swiss Banks' Code of Conduct with Regard to the Exercise of Due Diligence between the Swiss Bankers Association and the signatory banks required, in part, that Swiss banks document the beneficial owner of the assets in a particular account. Generally, the beneficial owners of the assets were natural persons, and the banks were required to document the beneficial owner's identity on a "Declaration of Identity of Beneficial Owner" ("Form A"), a standard form promulgated by the Swiss Bank Association for documenting the beneficial owners' identity.

8.     From in 2001 through at least April 13, 2023, in the Southern District of Florida and elsewhere, the defendants, **DAN ROTTA**, **SERGIO CERNEA**, and others, knowingly and willfully

3

conspired, confederated, and agreed to defraud the United States by impeding, impairing, obstructing, and defeating the lawful government functions of the IRS of the United States Department of Treasury, in the ascertainment, computation, assessment, and collection of the revenue, that is, ROTTA's federal income taxes for tax years 2001 through 2022, in violation of 18 U.S.C. § 371.

9.      ROTTA owned and/or controlled at various financial accounts in Switzerland between 1985 and 2020. ROTTA held his accounts using a pseudonym, foreign nominees, and layered ownership structures designed to conceal his assets and income from the IRS. ROTTA also held certain accounts in his own name. Regardless of the structure, ROTTA was the true owner of the assets in those accounts.

10.     Between 1985 and 2008, ROTTA held assets in Swiss bank accounts using false names and offshore corporate structures designed to conceal his accounts from the IRS. At various times, Swiss bankers suggested that ROTTA identify himself on account documents as a resident and citizen of Brazil even though those bankers knew or had reason to know that he was a U.S. citizen domiciled in the United States.

11.     On or about January 3, 1985, ROTTA opened an account in Switzerland at a predecessor of Credit Suisse AG (referred to herein collectively with its predecessors as "Credit Suisse") in the name of a pseudonym. In connection with the opening of the account, ROTTA executed documents that allowed him to use a pseudonym instead of his real name on account documents. ROTTA's pseudonym account remained open until around 1989, at which point ROTTA transferred the account's assets to new accounts that he opened at Credit Suisse held in the name of Vima, Inc ("Vima").

4

12.     In March 1989, ROTTA opened accounts in Vima's name at a corporate predecessor of UBS AG (referred to herein collectively with its predecessors as "UBS") and Credit Suisse. Vima was a nominee entity owned and controlled by ROTTA. Vima was a bearer-share corporation – meaning whoever held Vima's share certificates owned Vima. On paper, a Liechtenstein foundation called the NAD Foundation held Vima's share certificates for ROTTA's benefit. In reality, the tiered corporate structure was designed to conceal ROTTA's ownership and control of the Vima accounts. In connection with the opening of the accounts, ROTTA identified himself as the sole beneficial owner of the assets in the accounts on the account-opening documents that recorded such information, on a Form A, and gave himself signature authority over the accounts. On the account opening documents, ROTTA identified himself as a U.S. resident and listed his residence as his address on Park Avenue in New York. ROTTA maintained the Vima accounts at UBS and Credit Suisse until 2001, at which point he transferred the assets to new accounts held under a different ownership structure.

13.     In April 1998, ROTTA opened two new foreign financial accounts in his own name at another Swiss bank, Bank Julius Baer. In connection with the opening of the accounts, ROTTA identified himself on the Form A as the sole beneficial owner of the assets in the accounts and gave himself signature authority over the accounts. ROTTA also identified himself as a resident and citizen of Brazil on all relevant account documents. Personnel from the Swiss bank knew or should have known that ROTTA resided in the United States.

14.     Two months later, in June 1998, ROTTA signed an instruction directing Bank Julius Baer to close those accounts and transfer the assets to new accounts held in the name of Pevima Limited, a nominee entity and bearer-share corporation formed in the British Virgin Islands. In connection with the opening of the Pevima Limited accounts, the bank recorded ROTTA as

having power of attorney authority over the accounts and listed him on the Form A as the sole beneficial owner of the assets in at least one of the accounts. ROTTA also caused Bank Julius Baer to identify him as a resident and citizen of Brazil on all relevant account documents. Bank Julius Baer knew or should have known that ROTTA was a United States resident. ROTTA maintained the Pevima Limited accounts at Bank Julius Baer until around 2001.

15.     Between November 2000 and July 2001, ROTTA closed the Pevima and Vima accounts at Credit Suisse, UBS, and Bank Julius Baer and directed the banks to transfer the assets to new accounts at those banks held in the name of Citaro International Business Corporation LTD. ("Citaro"). ROTTA's transfer of his assets to new accounts held in Citaro's name coincided with new Swiss bank requirements for identifying U.S. accountholders that took effect in January 2001.

16.     In October 2000, at the suggestion of Credit Suisse and UBS, ROTTA hired Beda Singenberger ("Singenberger") and his fiduciary firm Sinco Treuhand AG to create the Citaro ownership structure. Like Vima, Citaro was a nominee entity owned and controlled by ROTTA. On paper, Citaro was a bearer-share corporation formed in the British Virgin Islands, and its shares were held by the NAD Foundation for ROTTA's benefit. Despite the layered structure, ROTTA was the owner of, and controlled the assets in, the Citaro accounts. In connection with the opening of the accounts, ROTTA was identified on Forms A as the sole beneficial owner of the Credit Suisse and Bank Julius Baer Citaro accounts, and executed a form for Sinco Treuhand identifying himself as the beneficial owner of the assets in the Citaro accounts. ROTTA also caused UBS, Credit Suisse, and Bank Julius Baer to identify him only as a resident and citizen of Brazil on all relevant account documents, even though he was a citizen and full-time resident of the United States. UBS, Credit Suisse, Bank Julius Baer, and Singenberger all knew or should have known that ROTTA was a United States resident.

17.     By 2001, ROTTA had over $19 million in net assets in Switzerland spread over the Citaro accounts at UBS, Credit Suisse, and Bank Julius Baer. The assets in those accounts generated substantial income each year that ROTTA used to fund his lifestyle by transferring just under $2 million to his accounts in the United States between 2001 and 2003.

18.     In 2003, ROTTA closed the Citaro accounts at UBS, Credit Suisse, and Bank Julius Baer and transferred the assets to newly opened accounts at those banks held under the name of Sky Delta Limited ("Sky Delta"), a Hong Kong corporation.

19.     Sky Delta was another nominee corporate entity created by Singenberger and his associates, and its ownership structure mirrored that of Citaro: the NAD Foundation held Sky Delta's shares in trust for ROTTA's benefit. Despite the layered structure, ROTTA owned and controlled the assets in the Sky Delta accounts. In connection with the opening of the Sky Delta accounts, ROTTA was identified as the sole beneficial owner on the Forms A for each of the Sky Delta accounts at UBS, Credit Suisse, and Bank Julius Baer. ROTTA also caused UBS, Credit Suisse, and Bank Julius Baer to identify him only as a resident and citizen of Brazil on all relevant Sky Delta account documents even though he was a citizen and full-time resident of the United States. UBS, Credit Suisse, Bank Julius Baer, and Singenberger all knew or should have known that ROTTA was a United States resident.

20.     Between 2003 and 2008, the Sky Delta accounts at UBS, Credit Suisse, and Bank Julius Baer collectively held assets valued between approximately $14 and $23 million that annually produced substantial investment income. ROTTA regularly used the income generated by the assets in the Sky Delta accounts to fund his lifestyle by transferring over $5.7 million to his accounts in the United States between during that time.

21.     ROTTA failed to file an FBAR for each calendar year between 2001 and 2008 reporting his interest in either the Citaro or Sky Delta accounts. Furthermore, ROTTA filed and/or caused the filing of false Forms 1040 for tax years 2001 through 2008 that falsely and fraudulently: (i) underreported his total income by omitting the income generated by his investments in those Swiss accounts, and (ii) failed to report his ownership interest in those Swiss accounts on Schedules B of his Form 1040.

22.     In December 2008, after it was publicly reported that UBS was under criminal investigation in the United States for helping U.S. taxpayers evade income taxes by concealing their accounts behind offshore corporate structures, ROTTA established a relationship with a new Swiss bank, Banque Bonhôte et Cie ("Banque Bonhôte" or "Bonhôte"), and opened another Sky Delta account at Banque Bonhôte. In 2009, ROTTA caused the transfer of the remaining assets in the UBS Sky Delta accounts to the new Banque Bonhôte Sky Delta account and terminated his relationship with UBS. In connection with the account opening, ROTTA was identified as the sole beneficial owner on the Form A for the Bonhôte Sky Delta account. ROTTA was identified only as a citizen and resident of Brazil on the Bonhôte Sky Delta account documents despite being a citizen and full-time resident of the United States. Bonhôte knew or should have known that ROTTA was a United States resident.

23.     In March 2009, it was publicly reported that U.S. authorities had expanded their criminal investigation to include enablers like Singenberger and his associates for helping U.S. taxpayers set up complicated offshore structures to hold their undeclared Swiss bank accounts and thereby evade their income taxes and reporting requirements. At the suggestion of his bankers, shortly thereafter, ROTTA engaged Bonhôte Trust SA ("Bonhôte Trust"), a fiduciary services company owned by Banque Bonhôte, to replace Singenberger and Sinco Treuhand as his Swiss fiduciary.

8

24.     ROTTA worked with Bonhôte Trust to create a new nominee structure to hold his assets. To transition ROTTA's assets from the Sky Delta accounts to the new structure, ROTTA caused the transfer of his assets in the Sky Delta accounts at Credit Suisse, Bank Julius Baer, and Bonhôte to new accounts held in ROTTA's name at those banks. As a result, in April 2009, ROTTA closed the Credit Suisse, Bank Julius Baer, and Bonhôte Sky Delta accounts and ordered the banks to transfer the assets to new accounts opened in his own name at those banks.

25.     Between April and September 2009, ROTTA held accounts in his own name at Credit Suisse, Bank Julius Baer, and Banque Bonhôte. ROTTA identified himself on the Forms A as the beneficial owner of the assets in the accounts held in his own name and gave himself signature authority over those accounts. On all relevant account documents, ROTTA identified himself as a resident and citizen of Brazil and signed false certifications attesting that he was neither a U.S. citizen nor a U.S. person subject to United States income tax withholding requirements. At that point, ROTTA had been a U.S. citizen and resident for over 30 years. Credit Suisse, Bank Julius Baer, and Banque Bonhôte all knew or should have known that ROTTA was a United States resident.

26.     By September 2009, ROTTA closed the accounts in his own name at Credit Suisse, Bank Julius Baer, and Banque Bonhôte and directed the banks to transfer the assets in those accounts to new accounts at Credit Suisse and Banque Bonhôte held in the name of Edelwiss Corporate Limited ("Edelwiss"). Edelwiss was a nominee corporate entity formed in the British Virgin Islands by Bonhôte Trust. On paper, Edelwiss's shares were held by The Putzo Foundation, a Liechtenstein Foundation established by Bonhôte Trust, for ROTTA's benefit. Despite the layered structure, ROTTA owned the assets in the Edelwiss accounts. In connection with the opening of the Edelwiss accounts, ROTTA was recorded on the Forms A as the sole beneficial owner of the assets in the Edelwiss accounts. ROTTA continued to identify himself only as a Brazilian national and

9

resident on the relevant Edelwiss account documents, even though he was a citizen and full-time resident of the United States. Bonhôte knew or should have known that ROTTA was a United States resident.

27.     In conjunction with the opening of the Edelwiss accounts, ROTTA entered a contract to rent a safe deposit box at Credit Suisse. To pay the fees associated with the safe deposit box rental, ROTTA opened an account in his own name. ROTTA maintained that account between 2009 and 2014. At the suggestion of the bankers, on account opening documents, ROTTA identified himself as the owner of the account and as a Brazilian citizen and resident, even though he was a citizen and full-time resident of the United States. The bankers at Credit Suisse knew or should have known that ROTTA was a United States resident.

28.     Between 2009 and 2011, the Edelwiss accounts at Credit Suisse and Banque Bonhôte collectively held substantial assets that annually produced substantial income. Like ROTTA's prior structures, Bonhôte Trust formally managed the Edelwiss accounts, and ROTTA lacked formal signature authority over the accounts. Despite the appearance that ROTTA lacked control over the accounts, ROTTA controlled the accounts and instructed Credit Suisse and Bonhôte in the disbursement of account assets. Indeed, between 2009 and 2011, ROTTA caused the transfer of over $2.8 million from the Edelwiss accounts to his domestic accounts in the United States.

29.     ROTTA willfully failed to file an FBAR for each calendar year between 2009 through 2011 reporting his interest in either the accounts in his own name and in the Edelwiss accounts. Furthermore, ROTTA filed and/or caused the filing of false Forms 1040 for tax years 2009 through 2011 that falsely and fraudulently: (i) underreported his total income by omitting the income generated by his investments in those accounts, and (ii) failed to report his ownership interest in those accounts on Schedules B of his Form 1040.

30.     On or about February 18, 2009, UBS entered into a Deferred Prosecution Agreement with the United States in which it admitted that it conspired to defraud the United States. As part of the agreement, it agreed to immediately provide the United States government with the identities of, and account information for, certain United States customers. It was widely reported that the disclosure of account information was an unprecedented, paradigm-shifting event in Swiss banking that for decades, had shielded account information behind what had seemed, until then, to be an impregnable legal wall of secrecy.

31.     In 2010, the Swiss Federal Tax Administration ("SFTA") notified ROTTA that his UBS Vima account records had been flagged for potential disclosure by UBS in response to an IRS summons. The SFTA was required to notify ROTTA as the beneficial owner of the assets in the Vima account to give him an opportunity to challenge the disclosure to the IRS. In response, ROTTA provided false documents to the SFTA attesting that he was not a U.S. taxpayer and that he lived in Brazil. He falsely attested in a signed affidavit that he was a Brazilian resident who was employed in Brazil for 15 years. In reality, ROTTA resided in New York and Florida between 1995 and 2010, and ROTTA was not employed in Brazil. The SFTA accepted ROTTA and CERNEA's false representations that ROTTA was neither a U.S. person nor subject to U.S. income tax and accordingly did not transmit the Vima accounts to the IRS under ROTTA's name.

32.     However, records in the UBS Vima account showed that ROTTA's close relative who also lived in the United States ("Relative 1") had signature authority over a safe deposit box account tied to the UBS Vima account. The SFTA ultimately produced records related to ROTTA's UBS Vima account under Relative 1's name in 2011.

33.     In July 2011, the IRS began an audit of Relative 1 based in part on the UBS Vima account documents it received from the SFTA. On or about August 4, 2011, an IRS Revenue Agent

interviewed Relative 1. Shortly thereafter, in September 2011, the Revenue Agent closed the audit of Relative 1 and referred ROTTA for audit as the possible owner of the assets in the UBS Vima account. Not long after the IRS interviewed Relative 1, ROTTA enlisted CERNEA to serve as the nominee owner of the Edelwiss accounts to further conceal his ownership and control of the assets in the Edelwiss accounts from the IRS.

34.     Between October and November 2011, ROTTA worked with Bonhôte Trust to create a new structure, the Putzo Settlement, that made it appear, on paper, that CERNEA owned the assets in the Edelwiss accounts. The Putzo Settlement was a Liechtenstein trust nominally settled by CERNEA to hold the shares of Edelwiss for the benefit of ROTTA and his family. Even though ROTTA had no formal role with the Putzo Settlement, he nonetheless maintained control over the accounts. ROTTA and CERNEA caused Credit Suisse and Banque Bonhôte to remove ROTTA as the beneficial owner of the assets in the Edelwiss accounts and caused CERNEA to be listed as the sole beneficial owner for the first time on new Forms A executed in November 2011.

35.     Between 2011 and 2016, CERNEA served as the nominee owner of the Edelwiss accounts and met with various Swiss bankers and other fiduciaries in that capacity. Despite the nominal change in ownership, ROTTA maintained dominion and control over the assets in the Edelwiss accounts by directing the investment of his assets and their distribution for his own benefit.

36.     ROTTA willfully failed to file an FBAR for each calendar year between 2012 and 2016 reporting his interest in the Edelwiss accounts. Furthermore, ROTTA filed and/or caused the filing of false Forms 1040 for tax years 2012 through 2016 that falsely and fraudulently: (i) underreported his total income by omitting the income generated by his investments in the Edelwiss accounts, and (ii) failed to report his ownership interest in the Citaro accounts on Schedules B of his Form 1040.

37.     In 2011, the IRS began an audit of ROTTA to determine, among other things, whether he had any unreported foreign financial accounts and earned income from the assets in those accounts for tax years 2008 through 2010. The IRS later expanded its audit to include tax years 2011 through 2013. During the audit, ROTTA falsely denied having unreported foreign financial accounts or income and conspired with CERNEA and Conspirator 1 to conceal his offshore accounts from the IRS. In 2014, the IRS assessed deficiencies related to ROTTA's unreported income in 2008 through 2010. ROTTA challenged those assessments in United States Tax Court by filing a petition that repeated the same false claims that he had presented during the audit. During the litigation, CERNEA and Conspirator 1 provided additional false documents and testimony to the IRS in support of those fabricated claims. In 2017, based on the false documents, statements, and testimony ROTTA, CERNEA, and Conspirator 1 provided during the litigation, the IRS consented to settle the Tax Court litigation and related audit with ROTTA and agreed that ROTTA owed neither additional income tax nor penalties for 2008 through 2013.

38.     Throughout the audit and subsequent United States Tax Court litigation, ROTTA employed numerous accountants and attorneys to represent him before the IRS and before the United States Tax Court, including Accountant 1, Accountant 2, Attorney 1, Attorney 2, Attorney 3, and Attorney 4, among others (collectively, the "Audit Representatives").

39.     Throughout the audit, ROTTA denied that he owned or controlled any foreign financial accounts and caused the Audit Representatives to falsely deny that he had any foreign financial accounts. ROTTA denied having unreported foreign financial accounts in telephone interviews with the IRS, during in-person interviews, in written correspondence to the IRS, and during two different sworn depositions taken by the IRS under penalties of perjury. ROTTA also caused the Audit Representatives to repeat the same false claims. ROTTA knew that the IRS did not

have bank records related to these accounts.

40.     By November 2012, the IRS had obtained copies of ROTTA's domestic bank records, which revealed that, during 2008, ROTTA received $1,450,000 in transfers from the Sky Delta accounts. When confronted with this fact, ROTTA and his Audit Representatives falsely claimed that the money he received in 2008 from Sky Delta was a loan from two friends who were non-U.S. persons, but ROTTA had no documentation to support the loan. ROTTA claimed that he would repay the loan when he sold his home on Oyster Bay.

41.     Eventually, ROTTA provided false documents to the IRS through the Audit Representatives to support the fabricated assertion that the funds received in 2008 from the Sky Delta accounts constituted a loan, allegedly received from two individuals who were Romanian nationals and citizens and residents of France (hereinafter, the "French Family Friends"). Among the false documents ROTTA provided to the IRS was a copy of a promissory note purportedly evidencing the loan, along with letters seemingly intended to bolster the note's legitimacy, including: (i) a letter from a New York attorney who had represented ROTTA and was a personal friend ("Attorney 5"); (ii) a letter from Conspirator 1; (iii) a letter from the son-in-law and purported successor in interest to the French Family Friends who had allegedly provided the loan; and (iv) a letter from CERNEA.

42.     The IRS Revenue Agent who handled the audit subsequently inquired about additional transfers ROTTA received from Sky Delta, which totaled $850,000 in 2009, and from Edelwiss, which totaled $2,801,000 between 2009 and 2011. In response, ROTTA falsely claimed that these transfers also were loans and caused the Audit Representatives to provide the IRS additional false promissory notes and letters from CERNEA and Conspirator 1 indicating they had found those notes among their records. ROTTA provided the IRS additional false promissory notes

evidencing "loans" purportedly received from Edelwiss in 2012 and 2013, as well as additional false affidavits and letters from CERNEA evidencing those loans.

43.    Despite ROTTA's efforts to deny ownership of any foreign financial accounts, on or about June 24, 2014, the IRS concluded the audit of tax years 2008 through 2010 by issuing ROTTA a Notice of Deficiency in which it proposed income tax deficiencies and penalties. The deficiencies assessed for 2008, 2009, and 2010 were based in part on the IRS rejecting ROTTA's claims that money received from Sky Delta and Edelwiss were loans and instead determined ROTTA received "other income" from these entities.

44.    While the IRS audit and Tax Court litigation were ongoing, ROTTA maintained between $18 and $24 million in assets in the Credit Suisse and Bonhôte Edelwiss accounts. ROTTA continued to actively manage the investments of those accounts and continued to direct transfers from the Edelwiss accounts to himself for his benefit. However, to conceal his use of the funds while he was under audit, ROTTA began routing his transfers from his foreign financial accounts through domestic bank accounts held in the names of CERNEA and others, including, a trust fund account held by Attorney 6, a Florida lawyer who represented ROTTA in various matters for over a decade.

45.    For example, ROTTA caused to be opened nominee accounts in CERNEA's name that he then used to receive transfers from his offshore accounts. In September 2012, a domestic Citibank account was opened in CERNEA's name ("the CERNEA Citibank account"), which was a nominee account under ROTTA's dominion and control. ROTTA maintained a document containing account information for the CERNEA Citibank account at his home on Fisher Island, including login information for online banking; debit card numbers, expiration dates, and security codes; wire instructions for the account; and answers to the account's security questions. The username and password for the CERNEA Citibank account included information personal to

ROTTA, rather than CERNEA. In May 2015, Attorney 6 became an authorized signer on the CERNEA Citibank account.

46. ROTTA used the CERNEA Citibank account as a passthrough to obscure his transfers from the Edelwiss accounts. Between November 2012 and March 2016, the CERNEA Citibank account received 10 wire transfers totaling just over $3.7 million from the Edelwiss accounts, almost all of which was then transferred to domestic accounts owned and/or controlled by ROTTA and to third parties as payment for ROTTA's benefit. At times, ROTTA directed Attorney 6 to make transfers from the CERNEA Citibank account for ROTTA's benefit.

47. During the audit, ROTTA also sought to conceal his control of the Edelwiss accounts by directing transfers through attorney trust accounts belonging to Attorney 5 and Attorney 6.

48. ROTTA and CERNEA also caused the formation of a sham trust called The Sergio 2014 Trust, a domestic trust purportedly settled by CERNEA for the benefit of ROTTA and his son. On paper, it appeared that CERNEA, the grantor, had contributed money to the trust to provide for ROTTA and his son, the beneficiaries. In fact, the trust was a sham and ROTTA used it as a nominee entity to conceal his assets and income from the IRS. ROTTA funded the trust with transfers of his own money from the Edelwiss accounts, and ROTTA used the funds he put in The Sergio 2014 Trust for his own benefit.

49. In 2013, certain media reports in United States media indicated that ROTTA was a United States resident. This news made its way to Switzerland, and as a result, Credit Suisse flagged ROTTA's Edelwiss accounts for termination as U.S. related accounts. In response, ROTTA and CERNEA went to Switzerland in December 2013, and ROTTA provided Credit Suisse with a letter in which he made a number of false representations, including, but not limited to: that he was not a

U.S. citizen, that he was not substantially present in the United States, and that in the future he would be in the United States only on a temporary basis (for stays of no more than four months a year).

50. On or about September 24, 2014, ROTTA caused to be filed a petition in United States Tax Court to contest the IRS's audit determinations of tax deficiencies for tax years 2008 through 2010. The petition repeated ROTTA's false assertions that he did not have any foreign financial accounts and that the funds he received from Sky Delta and Edelwiss were loans.

51. ROTTA's Tax Court petition claimed that, in 2008, ROTTA "asked long-time family friends . . . for loans;" that the French Family Friends agreed to advance him funds; and that the money would be repaid when ROTTA sold a home he owned in Oyster Bay. According to the petition, the French Family Friends "chose to have the loans made by Sky Delta, Ltd., a Hong Kong Company." In total, the petition claimed that, through Sky Delta, the French Family Friends had advanced ROTTA $1,450,000 (plus interest) in 2008 and $850,000 (plus interest) in 2009. In support of these claims, attached to the petition were "Promissory Notes" purportedly executed by ROTTA in favor of the French Family Friends "in the form in which it was presented to him."

52. In the petition, ROTTA further falsely claimed that the funds he received from Edelwiss in tax years 2009 and 2010 were loans from CERNEA. Specifically, the petition claimed that in 2009, after the French Family Friends died, ROTTA approached CERNEA for a loan, and CERNEA agreed to lend him $850,000, which was disbursed in two payments through Edelwiss. According to the petition, CERNEA then advanced ROTTA an additional $1 million in 2010 through Edelwiss. The petition claimed that CERNEA, like the French Family Friends, expected repayment after ROTTA sold his Oyster Bay home. Finally, the petition falsely claimed that ROTTA signed promissory notes in favor of Edelwiss to repay these loans.

53.     In the petition, ROTTA falsely claimed that there were no deficiencies for the relevant years and falsely alleged that the French Family Friends owned the assets in the Sky Delta accounts and CERNEA owned the assets in the Edelwiss accounts.

54.     In approximately June 2015, ROTTA's Audit Representative caused to be provided to the IRS an affidavit from CERNEA and a declaration from Conspirator 1, that stated that the funds ROTTA received from the Sky Delta and Edelwiss accounts were loans.

55.     In July and August 2016, CERNEA and Conspirator 1 traveled to New York and sat for interviews with IRS counsel regarding the "loans" ROTTA purportedly received from the Sky Delta and Edelwiss accounts. CERNEA falsely represented that he owned Edelwiss; that he extended loans to ROTTA based on their close personal relationship; and that ROTTA would repay the loans made through both Sky Delta and Edelwiss. Conspirator 1 falsely represented that the funds transferred through Sky Delta to ROTTA were bona fide loans from the French Family Friends; and that the loans remained outstanding obligations, which Conspirator 1 expected ROTTA to repay.

56.     In January of 2017, ROTTA presented false evidence to the IRS that he had in fact "repaid" the loans to CERNEA and Conspirator 1. ROTTA presented the IRS with a $4,400,000 check he had written to CERNEA and a $750,000 check he had written to Conspirator 1 as evidence that he had "repaid" the loans. The "loan repayments" were fake. The money was ultimately returned to nominee accounts controlled by ROTTA within months of the closure of the IRS audit. However, the IRS ultimately accepted the false evidence ROTTA presented. On or about February 8, 2017, the IRS consented to settle the Tax Court litigation with ROTTA and agreed that ROTTA owed neither additional income tax nor penalties for 2008 through 2010. On or about March 10, 2017, the IRS also agreed to settle ROTTA's 2011 through 2013 audit, which was on appeal with the IRS. For the same reasons as in the Tax Court case, based upon the fraudulent documents and false

testimony it received, the IRS agreed that ROTTA owed no additional income tax or penalties for 2011 through 2013.

57.     In November 2016, ROTTA began closing the Edelwiss accounts and transferring the assets to accounts held in the name of The Majestic Trust at another Swiss financial institution headquartered in Zurich, Switzerland ("Swiss Bank 1").

58.     ROTTA and CERNEA caused the formation of The Majestic Trust in October 2015. The Majestic Trust, like The Sergio 2014 Trust, was a sham and used by ROTTA as a nominee entity to conceal his assets and income from the IRS. On paper, it appeared that CERNEA, the grantor, had contributed money to the trust to provide for ROTTA and his son, the beneficiaries. In fact, ROTTA funded the trust with transfers of his own money from the Edelwiss accounts and continued to exercise dominion and control over those accounts.

59.     ROTTA caused Attorney 6 to open accounts in the trust's name at Swiss Bank 1 on or about November 14, 2016. In connection with the account opening, Attorney 6 identified The Majestic Trust as the owner of the account and, as trustee, retained signature authority over the accounts. Attorney 6 also caused Swiss Bank 1 to document CERNEA as the settlor of the trust, and to record ROTTA and his son as beneficiaries. This made it appear, on the Swiss Bank 1 account documents, that CERNEA funded The Majestic Trust accounts for the benefit of ROTTA and his son. In reality, ROTTA owned the assets in the Edelwiss accounts that funded The Majestic Trust. Furthermore, ROTTA continued to manage the assets in The Majestic Trust accounts as if they were his own.

60.     In 2018, the trustees amended The Majestic Trust to give them discretion to pay to CERNEA as much of The Majestic Trust's net income and/or principal as they determined. Thereafter, ROTTA caused distributions from The Majestic Trust's accounts to be made to the

19

CERNEA Citibank account, and other accounts under ROTTA's control. Thereafter, ROTTA claimed to The Majestic Trust's accountants that a portion of the trust's income was distributed to CERNEA, thereby substantially lowering the income ROTTA reported from the trust, and the taxes ROTTA paid on that income.

61.     By 2019, ROTTA became aware that the SFTA had been asked to produce certain of his Swiss account records to the IRS in response to the United States' request for foreign evidence.

62.     In June 2019, ROTTA engaged U.S. counsel and attempted to make a voluntary disclosure to the IRS to limit his exposure to criminal prosecution while simultaneously and fraudulently attempting to limit the penalties he would have to pay the IRS. At that time, under the IRS's Voluntary Disclosure Practice, certain taxpayers who committed tax or tax-related crimes and had criminal exposure due to their willful violation of the law could seek to possibly avoid criminal prosecution, at the discretion of the IRS. To do so, taxpayers had to become tax compliant and make a truthful, timely, and complete disclosure of their past misconduct. Among other things, taxpayers who willfully failed to report their foreign financial accounts could be subject to a penalty of 50% of the highest year's unreported balance.

63.     However, ROTTA submitted a false voluntary disclosure application in which he disclosed his interest in the Edelwiss accounts, and falsely claimed that only $2 million of the assets in the accounts belonged to him, while the rest belonged to CERNEA. Had the IRS accepted ROTTA's false claims, this could have capped his penalty at approximately $1 million.

64.     On or about July 9, 2019, ROTTA, through his attorney, submitted to the IRS Part I of Form 14457, "Voluntary Disclosure Practice Preclearance Request and Application" ("Voluntary Disclosure Application"). In that application, ROTTA admitted that he owned, controlled, or was the beneficial owner of the Edelwiss accounts at Credit Suisse and

20

Banque Bonhôte. This statement was in direct contrast to what he had previously told the IRS and claimed in his Tax Court petition.

65.     On or about November 8, 2019, ROTTA submitted to the IRS Part II of his Voluntary Disclosure Application, which he signed under penalties of perjury.

66.     Part II of ROTTA's Voluntary Disclosure Application provided an explanation for the source of funds in the Credit Suisse and Banque Bonhôte Edelwiss accounts and ROTTA's control over those funds. In his submission, ROTTA admitted, for the first time, that he owned and controlled Swiss bank accounts since the 1990s, but he falsely claimed that most of the assets in the Edelwiss accounts – approximately $13 million – came from CERNEA's father, to be held in trust for CERNEA. ROTTA claimed that only $2 million in the accounts belonged to him.

67.     In Part II of ROTTA's Voluntary Disclosure Application, ROTTA purported to explain why CERNEA created trusts for the benefit of ROTTA and his son. ROTTA falsely claimed that it was understood that when he and CERNEA died, all the remaining funds would pass to ROTTA's son because CERNEA had no children or other heirs. In fact, CERNEA had a son and a daughter, as well as a brother.

68.     In Part II of his Voluntary Disclosure Application, ROTTA also falsely claimed that he had attempted to come into compliance with his U.S. tax and reporting obligations. In fact, ROTTA had retained multiple attorneys to represent him in the IRS's audit and in Tax Court, and ROTTA used those attorneys to falsely claim that he did not have any foreign financial accounts.

69.     In December 2019, CERNEA came to the United States to make false statements under oath in support of ROTTA's false Voluntary Disclosure Application in anticipation of presenting those false statements to the IRS.

21

70.     Between 2019 and 2020, ROTTA caused the closure of The Majestic Trust's accounts at Swiss Bank 1 and directed the transfer of assets in those accounts to new accounts held in The Majestic Trust's name at JP Morgan Chase. Thereafter, ROTTA continued to actively manage The Majestic Trust's accounts at JP Morgan Chase, and regularly directed transfers for his benefit, though he continued to falsely claim that CERNEA received distributions from the trust.

71.     For tax years 2017 through 2022, ROTTA continued to conspire with CERNEA and others to defraud the IRS by concealing his assets and income in the sham trust structures, The Sergio 2014 Trust and The Majestic Trust. In reality, the assets held by those trusts belonged to ROTTA, and ROTTA was responsible for reporting all the income generated by the trusts' assets on his individual income tax returns. However, ROTTA filed and/or caused the filing of false tax returns and other documents with the IRS regarding the sham structures to fraudulently lower ROTTA's total income and tax liabilities. As a result, ROTTA falsely and fraudulently underreported his total income on his individual income tax returns for tax years 2017 through 2022 by failing to report all the income generated by the assets held in the sham trusts during that time.

KAREN E. KELLY
ACTING DEPUTY ASSISTANT ATTORNEY
GENERAL

Sean Beaty, Senior Litigation Counsel
District Court No. A5501870
Mark Daly, Senior Litigation Counsel
District Court No. A5501435
Patrick Elwell, Trial Attorney
District Court No. A5502696
William Montague, Trial Attorney
District Court No. A5502569
U.S. Department of Justice, Tax Division
(202) 616-2717
Sean.P.Beaty@usdoj.gov

Dan Rotta
Defendant

Jared E. Dwyer
Attorney for Defendant Dan Rotta